DECISION AND JUDGMENT ENTRY
This is an appeal from an order of the Lucas County Court of Common Pleas, Juvenile Division, terminating the parental rights of Theresa W. in regard to her then six year old daughter, Alliyah W., and granting permanent custody of the child to Lucas County Children Services ("LCCS"). Because we find that the trial court had no obligation to conduct an in camera interview of the child to learn her wishes for placement in this case, and because we find that LCCS met its legal obligations to consider alternative placements with relatives before it sought permanent custody of the child, we affirm the judgment of the trial court.
The record shows that in February 2001, the child was rushed to the emergency room of the Toledo Hospital because the child found a gun in her mother's purse, took the gun from the purse while her mother was sleeping on the floor, and shot herself in the chest. LCCS filed a complaint in dependency, neglect and abuse in the trial court and the trial court granted custody of the child to LCCS. The trial court subsequently appointed a guardian ad litem ("GAL"), an attorney for the child, and separate attorneys for the child's father and for the child's mother.
Through stipulation, the child was adjudicated dependant and abused. When the time came for consideration of a dispositional order, the father voluntarily surrendered his parental rights to the state. The mother, however, contested the request from LCCS that it be granted permanent custody of the child, so a dispositional hearing was held to consider evidence from the state and from witnesses called by the mother.
The only witness called by the state was the caseworker from LCCS who was assigned to the case after the child shot herself. Her testimony and exhibits offered by the state and admitted into evidence showed that the shooting incident was only the most recent traumatic event suffered by the child.
The caseworker testified that the child's mother had a long history of drug abuse, and that the mother had been sent to prison when the child was young. The child went to Atlanta, Georgia, to live with her father. While there, the child was sexually abused.
The caseworker said that the child had previously been removed from her mother's home and placed in foster care by the trial court in earlier proceedings brought by LCCS. Eventually, the child had been returned to her mother's custody, only to discover a gun in her mother's purse and to shoot herself.
The caseworker testified that she had tried to find an appropriate placement for the child with a relative. The most promising prospect, placement with a sister of the mother, was ruled out because the aunt's husband refused to sign a release to allow the caseworker to investigate his background for any criminal history. The caseworker testified that she could not approve a home study because the uncle had a "drug history" and had been incarcerated.
The caseworker said that the child had witnessed several incidents of domestic violence between her mother and various boyfriends of the mother. The child had also witnessed drug abuse. She said the child had been through a great deal of trauma for six years, with exposure to violence, sexual abuse, several different living arrangements, etc. She said that the child was excited about the possibility of being adopted.
The record contains agreed facts which include that at the time of the accident, the mother was under an order not to possess firearms of any kind because the mother had a previous felony conviction for aggravated burglary. The mother also admitted that she smoked crack cocaine the night before the shooting accident happened.
The exhibits admitted without objection include a copy of the mother's criminal record, the child's hospital records, copies of judgment entries showing that the mother had other children who were removed from her care (two were placed with the maternal grandmother, LCCS was granted permanent custody of the other three), the father's criminal record, and a copy of the judgment entry showing that in April 2001, as a result of the shooting accident, the mother was convicted of child endangering and of having a weapon while under a disability and was sentenced to serve two years in prison.
The state then rested its case, and the mother called witnesses on her behalf. The first witness called by the mother was a woman who had been the mother's friend for twelve years. The friend testified that she and the mother became acquainted in a recovery group for narcotics users. She testified that she was the mother's mentor.
The friend testified that the mother and child had a close, loving relationship. She acknowledged that the mother had never been fully successful in recovering from her drug addiction, but she believed that the child should be placed in foster care until the mother could accomplish recovery. She testified that she was going through training to be a foster parent, and offered to take the child to her home until an aunt of the child could get approval to care for the child while the mother served her prison term.
The child's aunt, who was the mother's sister, testified next. She too described a close, loving relationship between the mother and child. She opined that the child would be emotionally harmed if the mother lost her parental rights. She offered to take the child to her home until the mother was released from prison.
On cross-examination, the aunt admitted that her husband had refused to sign a release to permit LCCS to check his background to make certain that the child could safely be placed in the aunt's home. She also acknowledged that the child needed stable, permanent placement.
Next, the mother herself testified. She acknowledged that she had a past pattern of short times of abstention from drug use, followed by relapse into addiction. She said that she was older now, and believed she could make abstention from drug use permanent. She asked the court to place her child in foster care until she could complete her criminal sentence. She testified that she planned to reside in a monitored residence with her child after her release from prison so that she could learn how to provide the care and stability her child needs.
After the mother rested her case, the GAL testified regarding her recommendations in the case. She said she believed in the mother's sincere desire to recover and to provide the child with the care she needs. However, the GAL said she believed it was not in the best interest of the child for the court to keep the child in foster care while the mother served a prison term. She testified that she had seen the child in the potential adoptive home and she believed that adoption provided the best chance for the child to be loved, to be cared for and to be given a stable, safe home.
All counsel then made closing statements. When it was his turn, the child's attorney made the following statement:
 "Your Honor, in interviewing my client my first question was to determine what her wishes were so I could fulfill those in court. She told me she would like to go back with mom if it were to be safe, if it was different, not like it was before. So I took the position that the child doesn't want to go home given mom's past performance.
 "The fact that she's lost other children and she's, again, given case plans to follow, she's again, given opportunities and opportunities and opportunities. This is very evident, Your Honor, by the fact that my client was removed from the home, she was reunited and then she shot herself. Heaven forbid if we reunite again the child might end up dead next time, Your Honor.
 "I think clearly permanent custody is what my client is requesting. She is hopeful in anticipating adoption. This is what she's looking forward to, to stability and safeness in her home."
After closing remarks from all counsel, the trial court announced its decision to terminate the parental rights of the mom and to grant LCCS permanent custody of the child. The mother brought this appeal to challenge the ruling of the trial court.
She has presented two assignments of error for consideration on appeal that are:
"FIRST ASSIGNMENT OF ERROR
 THE STATEMENT OF THE CHILD'S WISHES BY HER ATTORNEY WERE AMBIGUOUS. THE TRIAL COURT SHOULD HAVE HELD AN IN CAMERA INTERVIEW WITH THE CHILD TO RESOLVE THE AMBIGUITY.
"SECOND ASSIGNMENT OF ERROR
 LCCS DID NOT FULFILL ITS MANDATE TO MAKE AGGRESSIVE EFFORTS TO REUNITE THE CHILD WITH HER FAMILY."
In support of her first assignment of error, the mother argues that all the witnesses agreed that the child loves her mother and is closely bonded with her mother. The mother says that the testimony of the caseworker that characterized the child as "sort of excited" about the prospect of being adopted does not show that the child really understood the concept of permanent custody. She says that the child's attorney's statement was also ambiguous regarding the true desires of the child and that the attorney "wandered into the realm of the guardian ad litem" when he predicted "dire consequences" if the child was reunited with the mother. She contends, therefore, that the trial court had an obligation to conduct an in camera interview of the child to learn directly from her what her desires were regarding the termination of the mother's parental rights.
First, we note that no one, including the mother, asked the trial court to conduct an in camera interview of the child. The mother has cited R.C. 3109.04(B)(1) to support her contention that an in camera interview of the child was required. That statute is primarily used in domestic cases where there is a dispute over custody. The statute provides that upon request from any party, the trial court should conduct an in camera
interview to learn directly from the child the child's wishes regarding custody orders relating to the child. R.C. 3109.04(B)(1). Even assumingarguendo that the statute is applicable in parental termination cases, since the trial court was not asked to hold an in camera interview of the child by any party in this case to learn the child's desires regarding custody, we find that the statutory provision relied upon by the mother has no application in this case.
In addition, our own review of the record shows no ambiguity with regard to the child's desires. While all witnesses agreed that the child loved her mother, the testimony was also clear that the child only wanted to return to live with her mother if the child would be safe and the circumstances in the home would be different. Since that desire did not seem likely to be realized, the child had become excited about the idea of being adopted and of living in a safe, stable home.
As the child's attorney stated, the child clearly wished to have a safe, stable home, and wanted permanent custody awarded to LCCS. The mother's first assignment of error is not well-taken and is denied.
In support of her second assignment of error, the mother argues that LCCS failed to make any "aggressive efforts" to reunite the child with some member of the child's family. The mother contends that LCCS failed to show that it clearly explained to the child's uncle why he needed to sign a release so that his criminal history could be checked. She also argues that the trial court should have accepted her friend's offer to take temporary custody of the child until the uncle did sign a release and the aunt and uncle were approved by LCCS to take custody of the child in their home.
The testimony of the caseworker shows that LCCS did attempt to find appropriate placement with relatives for the child before LCCS pursued its request for permanent custody. In addition, the child's aunt's testimony showed that she understood that the child could not be placed in her care until LCCS had all the necessary information to complete a home study, including the uncle's signature on a release to check his criminal records. Since the aunt was still asking that the trial court place the child in her home when she appeared to testify, it is reasonable to believe that she had explained to her husband the importance of his signature on the release.
In addition, we conclude that the trial court did not abuse its discretion when it chose not to accept the offer from the mother's friend to take the child until the child's aunt and uncle could be approved for placement. First, the child had already been through several changes regarding where she lived, (her mother's home, her father's home, a foster home, back to her mother's home until the accident and then to a second foster home) and the court could reasonably conclude that it was not in the best interest of the child to subject her to yet another temporary placement. Second, there was little reason to believe that the uncle would change his mind and sign the required release. Third, even if the uncle did sign the release, there was little reason to believe that LCCS would then conclude that the home of the child's aunt and uncle was suitable for placement.
Finally, we conclude that LCCS did not have a burden to show that there was no suitable relative to care for the child before the trial court could conclude that an award of permanent custody to LCCS was in the best interest of the child. This court has previously ruled that as a matter of law, neither a children's services agency seeking permanent custody nor a trial court considering a request for permanent custody has an obligation to determine that no appropriate relative is available for placement of the child before permanent custody is granted to the children's services agency. In the matter of: Cory Y. (Oct. 20, 1995), Lucas App. No. L-95-028, unreported. The mother's second assignment of error is not well-taken.
The judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. The mother is ordered to pay the court costs of this appeal.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, J., James R. Sherck, J., and Richard W. Knepper,J., CONCUR.